**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHRISTOPHER GORDON, an individual,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>DRAPE CREATIVE, INC., a Missouri corporation; PAPYRUS-RECYCLED GREETINGS, INC., an Illinois corporation,<br><br>*Defendants-Appellees.* | No. 16-56715<br><br>D.C. No.<br>2:15-cv-04905-<br>JFW-PLA<br><br><br><br>ORDER AND OPINION |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted April 9, 2018
Pasadena, California

Filed November 20, 2018

Before: Danny J. Boggs,[*] Jay S. Bybee,
and Paul J. Watford, Circuit Judges.

Order;
Opinion by Judge Bybee

---

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Trademark

The panel filed (1) an order granting appellees' petition for panel rehearing, withdrawing the panel's opinion, and ordering the filing of a superseding opinion; and (2) a superseding opinion reversing the district court's grant of summary judgment in favor of defendants in a trademark infringement suit under the Lanham Act.

In the superseding opinion, the panel held that, under the *Rogers* test, the Lanham Act applies to expressive works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. This balance will normally not support application of the Act unless the use of the mark (1) has no artistic relevance to the underlying work whatsoever, or (2) explicitly misleads consumers as to the source or the content of the work.

Defendants designed and produced greeting cards using "Honey Badger" catchphrases from plaintiff Christopher Gordon's YouTube video.

The panel resolved the first *Rogers* prong against Gordon as a matter of law. The panel held that there was a triable issue of fact as to *Rogers*'s second prong because defendants did not use Gordon's mark in the creation of a song, photograph, video game, or television show, but largely just pasted Gordon's mark into their greeting cards. The panel

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held that a jury could determine that this use of Gordon's mark was explicitly misleading as to the source or content of the cards. The panel reversed the district court and remanded for further proceedings.

## COUNSEL

Daniel L. Reback (argued) and Ralph C. Loeb, Krane & Smith, Encino, California, for Plaintiff-Appellant.

Douglas J. Collodel (argued) and James J.S. Holmes, Clyde & Co US LLP, Los Angeles, California, for Defendants-Appellees.

Mark A. Lemley, Professor, Stanford Law School, Stanford, California, for Amici Curiae 37 Intellectual Property Law Professors.

## ORDER

Appellees' petition for panel rehearing (Dkt. No. 39) is **GRANTED**. The opinion filed July 30, 2018, and published at 897 F.3d 1184, is withdrawn. The superseding opinion shall be filed concurrently with this order.

Further petitions for rehearing or petitions for rehearing en banc shall be allowed in the above-captioned matter. *See* Ninth Circuit General Order 5.3(a).

**OPINION**

BYBEE, Circuit Judge:

Plaintiff Christopher Gordon is the creator of a popular YouTube video known for its catchphrases "Honey Badger Don't Care" and "Honey Badger Don't Give a S---." Gordon has trademarked the former phrase for various classes of goods, including greeting cards. Defendants Drape Creative, Inc. ("DCI"), and Papyrus-Recycled Greetings, Inc. ("PRG"), designed and produced greeting cards using both phrases with slight variations. Gordon brought this suit for trademark infringement, and the district court granted summary judgment for defendants, holding that Gordon's claims were barred by the test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).

We use the *Rogers* test to balance the competing interests at stake when a trademark owner claims that an expressive work infringes on its trademark rights. The test construes the Lanham Act to apply to expressive works "only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id*. at 999. "[T]hat balance will normally not support application of the Act, unless the [use of the mark] has no artistic relevance to the underlying work whatsoever, or . . . explicitly misleads [consumers] as to the source or the content of the work." *Id.*

The *Rogers* test is not an automatic safe harbor for any minimally expressive work that copies someone else's mark. Although on every prior occasion in which we have applied the test, we have found that it barred an infringement claim as a matter of law, this case presents a triable issue of fact. Defendants have not used Gordon's mark in the creation of a

song, photograph, video game, or television show, but have largely just pasted Gordon's mark into their greeting cards. A jury could determine that this use of Gordon's mark is explicitly misleading as to the source or content of the cards. We therefore reverse the district court's grant of summary judgment and remand for further proceedings on Gordon's claims.

## I

Plaintiff Christopher Gordon is a comedian, writer, and actor, who commonly uses the name "Randall" as an alias on social media.[1] Defendant DCI is a greeting-card design studio. DCI works exclusively with American Greetings Corporation and its subsidiaries, which include the other defendant in this case, PRG. PRG is a greeting-card manufacturer and distributor.

## A

In January 2011, under the name Randall, Gordon posted a video on YouTube titled *The Crazy Nastyass Honey Badger*, featuring National Geographic footage of a honey badger overlaid with Gordon's narration. In the video, Gordon repeats variations of the phrases "Honey Badger Don't Care" and "Honey Badger Don't Give a S---," as a honey badger hunts and eats its prey. The parties refer to these phrases as "HBDC" and "HBDGS," and we adopt their convention.

---

[1] Because this case comes to us on appeal from a grant of summary judgment for defendants, we recount the facts in the light most favorable to Gordon. *See VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 875 (9th Cir. 2016).

Gordon's video quickly generated millions of views on YouTube and became the subject of numerous pop-culture references in television shows, magazines, and social media. As early as February 2011, Gordon began producing and selling goods with the HBDC or HBDGS phrases, such as books, wall calendars, t-shirts, costumes, plush toys, mouse pads, mugs, and decals. Some of the items were sold online; others were sold through national retailers such as Wal-Mart, Target, Urban Outfitters, and Hot Topic. In June 2011, Gordon copyrighted his video's narration under the title *Honey Badger Don't Care*, and in October 2011, he began filing trademark applications for the HBDC phrase for various classes of goods. The Patent and Trademark Office ("PTO") eventually registered "Honey Badger Don't Care" for International Classes 9 (audio books, etc.), 16 (greeting cards, etc.), 21 (mugs), 25 (clothing), and 28 (Christmas decorations, dolls, etc.).[2] However, Gordon never registered the HBDGS phrase for any class of goods.

At the peak of his popularity, Gordon promoted his brand on television and radio shows and in interviews with national publications such as *Forbes*, *The Wall Street Journal*, and *The Huffington Post*. His brand was further boosted by celebrities like Taylor Swift and Anderson Cooper quoting his video and by LSU football players tagging their teammate, Heisman Trophy finalist Tyrann Mathieu, with the moniker "Honey Badger" for his aggressive defensive play.

---

[2] Between January 2013 and April 2014, the PTO issued registrations for HBDC in International Classes 9, 21, 25, and 28. The PTO did not issue a registration for HBDC in International Class 16—which includes greeting cards—until October 2016, well after Gordon filed this suit. The timing of Gordon's registrations, however, is immaterial to the *Rogers* inquiry.

In November 2011, *Advertising Age* referred to Gordon's brand as one of "America's Hottest Brands" in an article titled "Hot Brand? Honey Badger Don't Care."

B

In January 2012, Gordon hired Paul Leonhardt to serve as his licensing agent. Soon thereafter, Leonhardt contacted Janice Ross at American Greetings—the parent company of defendant PRG—to discuss licensing honey-badger themed greeting cards. Leonhardt and Ross had multiple email exchanges and conversations over several weeks. Ross at one point expressed some interest in a licensing agreement, stating: "I think it's a really fun and irreverent property and would love to see if there's an opportunity on one of our distribution platforms. But in order to do that, I need to get some key colleagues of mine on board the Crazy Honey Badger Bandwagon." Nevertheless, neither American Greetings nor defendants ever signed a licensing agreement with Gordon.

Leonhardt did eventually secure several licensing deals for Gordon. Between May and October 2012, Gordon's company—Randall's Honey Badger, LLC ("RHB")—entered into licensing agreements with Zazzle, Inc., and The Duck Company for various honey-badger themed products, including greeting cards. RHB also entered into licensing agreements with other companies for honey-badger costumes, toys, t-shirts, sweatshirts, posters, and decals, among other things. HBDC and HBDGS were the two most common phrases used on these licensed products. For example, two of Zazzle's best-selling honey-badger greeting cards stated on their front covers "Honey Badger Don't Care About Your Birthday."

At the same time that Gordon was negotiating licensing agreements with Zazzle and Duck, defendants began developing their own line of unlicensed honey-badger greeting cards. Beginning in June 2012, defendants sold seven different greeting cards using the HBDC or HBDGS phrases with small variations:

- The fronts of two "Election Cards" showed a picture of a honey badger wearing a patriotic hat and stated "The Election's Coming." The inside of one card said "Me and Honey Badger don't give a $#%@! Happy Birthday," and the inside of the other said "Honey Badger and me just don't care. Happy Birthday."

- The fronts of two "Birthday Cards" featured different pictures of a honey badger and stated either "It's Your Birthday!" or "Honey Badger Heard It's Your Birthday." The inside of both cards said "Honey Badger Don't Give a S---."

- The fronts of two "Halloween Cards" showed a picture of a honey badger next to a jack-o-lantern and stated "Halloween is Here." The inside of the cards said either "Honey Badger don't give a $#*%!" or "Honey Badger don't give a s---."

- A "Critter Card" employed a Twitter-style format showing a series of messages from "Honey Badger@don'tgiveas---." The

front stated "Just killed a cobra. Don't give a s---"; "Just ate a scorpion. Don't give a s---"; and "Rolling in fire ants. Don't give a s---."[3] The inside said "Your Birthday's here. . . I give a s---."

The back cover of each card displayed the mark for "Recycled Paper Greetings" and listed the websites www.DCIStudios.com and www.prgreetings.com. DCI's President testified that he drafted all of the cards in question but could not recall what inspired the cards' designs. He claimed to have never heard of a video involving a honey badger.

In June 2015, Gordon filed this suit against DCI and PRG, alleging trademark infringement under the Lanham Act, among other claims. The district court granted summary judgment for defendants, holding that defendants' greeting cards were expressive works, and applying the *Rogers* test to bar all of Gordon's claims. Gordon timely appealed.[4]

---

[3] Gordon's video refers to a honey badger getting stung by bees and eating a cobra—e.g., "Now look, here's a house full of bees. You think the honey badger cares? It doesn't give a s---. . . . But look the honey badger doesn't care, it's getting stung like a thousand times. It doesn't give a s--- . . . . Look! Here comes a fierce battle between a king cobra and a honey badger. . . . And of course, what does a honey badger have to eat for the next few weeks? Cobra."

[4] We have jurisdiction under 28 U.S.C. § 1291, and we review the district court's grant of summary judgment de novo. *See Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806 (9th Cir. 2003).

II

The Lanham Act, 15 U.S.C. § 1051 *et seq.*, "creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010). The Act's two underlying purposes are to ensure that (1) "owners of trademarks can benefit from the goodwill associated with their marks" and (2) "consumers can distinguish among competing producers." *Id.*; *see also* J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 2:2 (5th ed.) ("MCCARTHY") (explaining the dual purposes of trademark law).

Under the Act, the owner of a trademark used in commerce may register the mark with the PTO. Registration is prima facie evidence of the mark's validity and of the owner's exclusive right to use the mark in connection with the goods and services specified in the registration. 15 U.S.C. § 1057(b). The owner has a cause of action against any person who, without the owner's consent, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." *Id.* § 1114(1)(a); *see also id.* § 1125(a) (providing a similar cause of action for "false designation of origin, false or misleading

description of fact, or false or misleading representation of fact," irrespective of registration).[5]

In general, we apply a "likelihood-of-confusion test" to claims brought under the Lanham Act. *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806–07 (9th Cir. 2003). The likelihood-of-confusion test requires the plaintiff to prove two elements: (1) that "it has a valid, protectable trademark" and (2) that "the defendant's use of the mark is likely to cause confusion." *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 929 (9th Cir. 2014) (alteration omitted).[6] Ordinarily, this test "strikes a

---

[5] The district court declined to distinguish between HBDC, which is a registered trademark, and HBDGS, which is not. We assume for purposes of this decision that HBDC and HBDGS are both protected marks, even if HBDGS is not registered. *See Matal v. Tam*, 137 S. Ct. 1744, 1752 (2017) (explaining that "an unregistered trademark can be enforced against would-be infringers" under 15 U.S.C. § 1125(a)); *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241 (9th Cir. 2013) (noting that the *Rogers* test applies "in [§ 1125(a)] cases involving expressive works"). Gordon claimed infringement under § 1125(a) in his complaint, and defendants challenged Gordon's ownership of HBDGS as a protected mark in their motion for summary judgment. The district court is free to revisit this issue on remand.

[6] We have identified eight factors—called the *Sleekcraft* factors—for determining whether a defendant's use of the mark is likely to cause consumer confusion:

> (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in

comfortable balance" between the Lanham Act and the First Amendment. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002).

That said, where artistic expression is at issue, we have expressed concern that "the traditional test fails to account for the full weight of the public's interest in free expression." *Id.* The owner of a trademark "does not have the right to control public discourse" by enforcing his mark. *Id.* We have adopted the Second Circuit's *Rogers* test to strike an appropriate balance between First Amendment interests in protecting artistic expression and the Lanham Act's purposes to secure trademarks rights. Under *Rogers*, we read the Act "to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 901 (quoting *Rogers*, 875 F.2d at 999). More concretely, we apply the Act to an expressive work only if the defendant's use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads consumers as to the source or the content of the work. *See id.* at 902. Effectively, *Rogers* employs the First Amendment as a rule of construction to avoid conflict between the Constitution and the Lanham Act.

We pause here to clarify the burden of proof under the *Rogers* test. The *Rogers* test requires the defendant to make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment.

---

selecting the mark; and (8) the likelihood of expansion of the product lines.

*Zaffina*, 762 F.3d at 930 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)).

If the defendant successfully makes that threshold showing, then the plaintiff claiming trademark infringement bears a heightened burden—the plaintiff must satisfy not only the likelihood-of-confusion test but also at least one of *Rogers*'s two prongs. *Cf. Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013) (if a defendant meets its "initial burden" of showing a First Amendment interest, then a public-figure plaintiff claiming defamation must meet a "heightened standard of proof" requiring a showing of "actual malice"). That is, when the defendant demonstrates that First Amendment interests are at stake, the plaintiff claiming infringement must show (1) that it has a valid, protectable trademark, and (2) that the mark is either not artistically relevant to the underlying work *or* explicitly misleading as to the source or content of the work. If the plaintiff satisfies both elements, it still must prove that its trademark has been infringed by showing that the defendant's use of the mark is likely to cause confusion.[7]

"Summary judgment may properly be entered only against a party who has failed to make a showing sufficient to establish a genuine dispute as to the existence of an

---

[7] We have been careful not to "conflate[] the ['explicitly misleading'] prong of the *Rogers* test with the general *Sleekcraft* likelihood-of-confusion test," *Twentieth Century Fox*, 875 F.3d at 1199, but it bears noting that *Twentieth Century Fox* made this distinction to ensure that the likelihood-of-confusion test did not dilute *Rogers*'s explicitly misleading prong. Other circuits have noted that *Rogers*'s second prong is essentially a more exacting version of the likelihood-of-confusion test. *See Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 665 (5th Cir. 2000); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993). A plaintiff who satisfies the "explicitly misleading" portion of *Rogers* should therefore have little difficulty showing a likelihood of confusion.

element essential to his case and upon which the party will bear the burden of proof at trial." *Easley v. City of Riverside*, 890 F.3d 851, 859 (9th Cir. 2018). When, as here, the defendant moves for summary judgment and has demonstrated that its use of the plaintiff's mark is part of an expressive work, the burden shifts to the plaintiff to raise a genuine dispute as to at least one of *Rogers*'s two prongs. In other words, to evade summary judgment, the plaintiff must show a triable issue of fact as to whether the mark is artistically relevant to the underlying work or explicitly misleads consumers as to the source or content of the work.

## III

Before applying the *Rogers* test to the instant case, we briefly review the test's origin in the Second Circuit and development in our court.[8] We have applied the *Rogers* test on five separate occasions, and each time we have concluded that it barred the trademark-infringement claim as a matter of law. Three of those cases, like *Rogers*, involved the use of a trademark in the title of an expressive work. Two cases involved trademarks in video games and extended the *Rogers* test to the use of a trademark in the body of an expressive work.

## A

The *Rogers* case concerned the movie *Ginger and Fred*, a story of two fictional Italian cabaret performers who

---

[8] The *Rogers* test has been adopted in other circuits as well. *See Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012); *Parks v. LaFace Records*, 329 F.3d 437, 452 (6th Cir. 2003); *Westchester Media*, 214 F.3d at 665.

imitated the famed Hollywood duo of Ginger Rogers and Fred Astaire. 875 F.2d at 996–97. Rogers sued the film's producers under the Lanham Act, alleging that the film's title gave the false impression that the film—created and directed by well-known filmmaker Federico Fellini—was about her or sponsored by her. *Id.* at 997. The district court, however, granted summary judgment for the defendant film producers. *Id.*

On appeal, the Second Circuit recognized that, "[t]hough First Amendment concerns do not insulate titles of artistic works from all Lanham Act claims, such concerns must nonetheless inform our consideration of the scope of the Act as applied to claims involving such titles." *Id.* at 998. The court said it would construe the Lanham Act "to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 999. Refining its inquiry, the court further held that, "[i]n the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless [1] the title has no artistic relevance to the underlying work whatsoever, or, [2] if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Id.*

With respect to artistic relevance, the Second Circuit found that the names "Ginger" and "Fred" were "not arbitrarily chosen just to exploit the publicity value of their real life counterparts" but had "genuine relevance to the film's story." *Id.* at 1001. The film's title was "truthful as to its content" and conveyed "an ironic meaning that [was] relevant to the film's content." *Id.* On the second prong of its inquiry, the court held that the title was not explicitly misleading because it "contain[ed] no explicit indication that

Rogers endorsed the film or had a role in producing it." *Id.* Any risk that the title would mislead consumers was "outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression." *Id.* The Second Circuit therefore affirmed summary judgment for the defendant film producers. *Id.* at 1005.

B

We first employed the *Rogers* test in *MCA Records*, 296 F.3d 894, which concerned the song "Barbie Girl" by the Danish band Aqua. The song—which lampooned the values and lifestyle that the songwriter associated with Barbie dolls—involved one band member impersonating Barbie and singing in a high-pitched, doll-like voice. *Id.* at 899. Mattel, the manufacturer of Barbie dolls, sued the producers and distributors of "Barbie Girl" for infringement under the Lanham Act, and the district court granted summary judgment for the defendants. *Id.* Applying the *Rogers* test, we affirmed. *Id.* at 902. We held that the use of the Barbie mark in the song's title was artistically relevant to the underlying work because the song was "about Barbie and the values Aqua claims she represents." *Id.* In addition, the song "d[id] not, explicitly or otherwise, suggest that it was produced by Mattel." *Id.* "The *only* indication that Mattel might be associated with the song [was] the use of Barbie in the title," and if the use of the mark alone were enough to satisfy *Rogers*'s second prong, "it would render *Rogers* a nullity." *Id.* Because the Barbie mark was artistically relevant to the song and not explicitly misleading, we concluded that the band could not be held liable for infringement.

We applied the *Rogers* test to another suit involving Barbie in *Walking Mountain*, 353 F.3d 792. There, photographer Thomas Forsythe developed a series of photographs titled "Food Chain Barbie" depicting Barbie dolls or parts of Barbie dolls in absurd positions, often involving kitchen appliances. *Id.* at 796. Forsythe described the photographs as critiquing "the objectification of women associated with [Barbie]." *Id.* Mattel claimed that the photos infringed its trademark and trade dress, but we affirmed summary judgment for Forsythe because "[a]pplication of the *Rogers* test here leads to the same result as it did in *MCA*." *Id.* at 807. Forsythe's use of the Barbie mark was artistically relevant to his work because his photographs depicted Barbie and targeted the doll with a parodic message. *Id.* Moreover, apart from Forsythe's use of the mark, there was no indication that Mattel in any way created or sponsored the photographs. *Id.*

Most recently, we applied the *Rogers* test in *Twentieth Century Fox*, 875 F.3d 1192. Twentieth Century Fox produced the television show *Empire*, which revolved around a fictional hip-hop record label named "Empire Enterprises." *Id.* at 1195. Empire Distribution, an actual hip-hop record label, sent Twentieth Century Fox a cease-and-desist letter, and Twentieth Century Fox sued for a declaratory judgment that its show did not violate Empire's trademark rights. *Id.* In affirming summary judgment for Twentieth Century Fox, we rejected Empire's argument that "the *Rogers* test includes a threshold requirement that a mark have attained a meaning beyond its source-identifying function."[9] *Id.* at 1197.

---

[9] We explained in *MCA Records* that trademarks sometimes "transcend their identifying purpose" and "become an integral part of our

Whether a mark conveys a meaning beyond identifying a product's source is not a threshold requirement but only a relevant consideration: "trademarks that transcend their identifying purpose are more likely to be used in artistically relevant ways," but such transcendence is not necessary to trigger First Amendment protection. *Id.* at 1198 (quotation marks and citation omitted).

We concluded that Empire could not satisfy *Rogers*'s first prong because Twentieth Century Fox "used the common English word 'Empire' for artistically relevant reasons," namely, that the show's setting was New York (the Empire State) and its subject matter was an entertainment conglomerate (a figurative empire). *Id.* Finally, we resisted Empire's efforts to conflate the likelihood-of-confusion test with *Rogers*'s second prong. To satisfy that prong, it is not enough to show that "the defendant's use of the mark would confuse consumers as to the source, sponsorship or content of the work"; rather, the plaintiff must show that the defendant's use "*explicitly* misl[ed] consumers." *Id.* at 1199. Because Twentieth Century Fox's *Empire* show contained "no overt claims or explicit references to Empire Distribution," we found that Empire could not satisfy *Rogers*'s second prong. *Id.* Empire's inability to satisfy either of *Rogers*'s two prongs meant that it could not prevail on its infringement claim.

## C

We first extended the *Rogers* test beyond a title in *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d

---

vocabulary." 296 F.3d at 900. Examples include "Rolls Royce" as proof of quality or "Band-Aid" for any quick fix.

1095, 1099 (9th Cir. 2008). In that case, defendant Rockstar Games manufactured and distributed the video game *Grand Theft Auto: San Andreas*, which took place in a fictionalized version of Los Angeles. *Id.* at 1096–97. One of the game's neighborhoods—East Los Santos—"lampooned the seedy underbelly" of East Los Angeles by mimicking its businesses and architecture. *Id.* at 1097. The fictional East Los Santos included a virtual strip club called the "Pig Pen." *Id.* ESS Entertainment 2000, which operates the Play Pen Gentlemen's Club in the real East Los Angeles, claimed that Rockstar's depiction of the Pig Pen infringed its trademark and trade dress. *Id.*

We recognized that the *Rogers* test was developed in a case involving a title, and adopted by our court in a similar case, but we could find "no principled reason why it ought not also apply to the use of a trademark in the body of the work." *Id.* at 1099. With respect to *Rogers*'s first prong, we explained that "[t]he level of relevance merely must be above zero" and the Pig Pen met this threshold by being relevant to Rockstar's artistic goal of creating "a cartoon-style parody of East Los Angeles." *Id.* at 1100. On the second prong, we concluded that the game did not explicitly mislead as to the source of the mark and would not "confuse its players into thinking that the Play Pen is somehow behind the Pig Pen or that it sponsors Rockstar's product. . . . A reasonable consumer would not think a company that owns one strip club in East Los Angeles . . . also produces a technologically sophisticated video game." *Id.* at 1100–01. Because ESS Entertainment 2000 could not demonstrate either of *Rogers*'s two prongs, we affirmed summary judgment for Rockstar.

Another video-game case dealt with the *Madden NFL* series produced by Electronic Arts, Inc. ("EA"). *Brown v.*

*Elec. Arts, Inc.*, 724 F.3d 1235 (9th Cir. 2013). Legendary football player Jim Brown alleged that EA violated § 43(a) of the Lanham Act by using his likeness in its games. *Id.* at 1238–39. The district court granted EA's motion to dismiss, and we affirmed. *Id.* at 1239. We reiterated *E.S.S.*'s holding that the level of artistic relevance under *Rogers*'s first prong need only exceed zero and found it was "obvious that Brown's likeness ha[d] at least some artistic relevance to EA's work." *Id.* at 1243. We also found that Brown had not alleged facts that would satisfy *Rogers*'s second prong: "EA did not produce a game called *Jim Brown Presents Pinball* with no relation to Jim Brown or football beyond the title; it produced a football game featuring likenesses of thousands of current and former NFL players, including Brown." *Id.* at 1244. We asked "whether the use of Brown's likeness would confuse *Madden NFL* players into thinking that Brown is somehow behind the games or that he sponsors EA's product," and held that it would not. *Id.* at 1245–47 (alterations omitted). As in *E.S.S.*, the plaintiff could not satisfy either of *Rogers*'s two prongs, and judgment for the defendant was proper.

IV

In each of the cases coming before our court, the evidence was such that no reasonable jury could have found for the plaintiff on either prong of the *Rogers* test, and we therefore concluded that the plaintiff's Lanham Act claim failed as a matter of law. This case, however, demonstrates *Rogers*'s outer limits. Although defendants' greeting cards are expressive works to which *Rogers* applies, there remains a genuine issue of material fact as to *Rogers*'s second prong—i.e., whether defendants' use of Gordon's mark in their greeting cards is explicitly misleading.

A

As a threshold matter, we have little difficulty determining that defendants have met their initial burden of demonstrating that their greeting cards are expressive works protected under the First Amendment. As we have previously observed, "[a greeting] card certainly evinces '[a]n intent to convey a particularized message . . . , and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'" *Hilton v. Hallmark Cards*, 599 F.3d 894, 904 (9th Cir. 2010) (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974) (per curiam)); *see also Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970) (plaintiff's greeting cards, considered as a whole, "represent[ed] a tangible expression of an idea" and hence were copyrightable). Each of defendants' cards relies on graphics and text to convey a humorous message through the juxtaposition of an event of some significance—a birthday, Halloween, an election—with the honey badger's aggressive assertion of apathy. Although the cards may not share the creative artistry of Charles Schulz or Sandra Boynton, the First Amendment protects expressive works "[e]ven if [they are] not the expressive equal of *Anna Karenina* or *Citizen Kane*." *Brown*, 724 F.3d at 1241. Because defendants have met their initial burden, the burden shifts to Gordon to raise a triable issue of fact as to at least one of *Rogers*'s two prongs.

B

*Rogers*'s first prong requires proof that defendants' use of Gordon's mark was not "artistically relevant" to defendants' greeting cards. We have said that "the level of artistic relevance of the trademark or other identifying material to the

work merely must be above zero." *Id.* at 1243 (internal alterations omitted) (quoting *E.S.S.*, 547 F.3d at 1100). Indeed, "even the slightest artistic relevance" will suffice; courts and juries should not have to engage in extensive "artistic analysis." *Id.* at 1243, 1245; *see Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits.").

Gordon's mark is certainly relevant to defendants' greeting cards; the phrase is the punchline on which the cards' humor turns. In six of the seven cards, the front cover sets up an expectation that an event will be treated as important, and the inside of the card dispels that expectation with either the HBDC or HBDGS phrase. The last card, the "Critter Card," operates in reverse: the front cover uses variations of the HBDGS phrase to establish an apathetic tone, while the inside conveys that the card's sender actually cares about the recipient's birthday. We thus conclude that Gordon has not raised a triable issue of fact with respect to *Rogers*'s "artistic relevance" prong.

## C

Even if the use of the mark is artistically relevant to the work, the creator of the work can be liable under the Lanham Act if the creator's use of the mark is "explicitly misleading as to source or content." *Rogers*, 875 F.2d at 999. "This second prong of the *Rogers* test 'points directly at the purpose of trademark law, namely to avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into buying a product they

mistakenly believe is sponsored [or created] by the trademark owner.'" *Brown*, 724 F.3d at 1245 (quoting *E.S.S.*, 547 F.3d at 1100). The "key here [is] that the creator must *explicitly* mislead consumers," and we accordingly focus on "the nature of the [junior user's] behavior" rather than on "the impact of the use." *Id.* at 1245–46.

In applying this prong, however, we must remain mindful of the purpose of the *Rogers* test, which is to balance "the public interest in avoiding consumer confusion" against "the public interest in free expression." *Rogers*, 875 F.2d at 999. This is not a mechanical test—"all of the relevant facts and circumstances" must be considered. *Id.* at 1000 n.6. We therefore reject the district court's rigid requirement that, to be explicitly misleading, the defendant must make an "affirmative statement of the plaintiff's sponsorship or endorsement." Such a statement may be sufficient to show that the use of a mark is explicitly misleading, but it is not a prerequisite. *See* MCCARTHY § 10:17.10 (noting that *Rogers*'s second prong does not hinge on the junior user "falsely assert[ing] that there is an affiliation"). In some instances, the use of a mark alone may explicitly mislead consumers about a product's source if consumers would ordinarily identify the source by the mark itself. If an artist pastes Disney's trademark at the bottom corner of a painting that depicts Mickey Mouse, the use of Disney's mark, while arguably relevant to the subject of the painting, could explicitly mislead consumers that Disney created or authorized the painting, even if those words do not appear alongside the mark itself.

To be sure, we have repeatedly observed that "the mere use of a trademark alone cannot suffice to make such use explicitly misleading." *E.S.S.*, 547 F.3d at 1100 (citing *MCA*

*Records*, 296 F.3d at 902).  But each time we have made this observation, it was clear that consumers would not view the mark alone as identifying the source of the artistic work.  No one would think that a song or a photograph titled "Barbie" was created by Mattel, because consumers "do not expect [titles] to identify" the "origin" of the work.  *MCA Records*, 296 F.3d at 902.  Nor would anyone "think a company that owns one strip club in East Los Angeles . . . also produces a technologically sophisticated video game."  *E.S.S.*, 547 F.3d at 1100–01.  But this reasoning does not extend to instances in which consumers *would* expect the use of a mark alone to identify the source.

A more relevant consideration is the degree to which the junior user uses the mark in the same way as the senior user.  In the cases in which we have applied the *Rogers* test, the junior user has employed the mark in a different context—often in an entirely different market—than the senior user.  In *MCA Records* and *Walking Mountain*, for example, Mattel's Barbie mark was used in a song and a series of photos.  In *E.S.S.*, the mark of a strip club was used in a video game.  And in *Twentieth Century Fox*, the mark of a record label was used in a television show.  In each of these cases, the senior user and junior user used the mark in different ways.  This disparate use of the mark was at most "only suggestive" of the product's source and therefore did not outweigh the junior user's First Amendment interests.  *Rogers*, 875 F.2d at 1000.

But had the junior user in these cases used the mark in the same way as the senior user—had Twentieth Century Fox titled its new show *Law & Order: Special Hip-Hop*

*Unit*[10]—such identical usage could reflect the type of "explicitly misleading description" of source that *Rogers* condemns. 875 F.2d at 999–1000. *Rogers* itself makes this point by noting that "misleading titles that are confusingly similar *to other titles*" can be explicitly misleading, regardless of artistic relevance. *Id.* at 999 n.5 (emphasis added). Indeed, the potential for explicitly misleading usage is especially strong when the senior user and the junior user both use the mark in similar artistic expressions. Were we to reflexively apply *Rogers*'s second prong in this circumstance, an artist who uses a trademark to identify the source of his or her product would be at a significant disadvantage in warding off infringement by another artist, merely because the product being created by the other artist is also "art." That would turn trademark law on its head.

A second consideration relevant to the "explicitly misleading" inquiry is the extent to which the junior user has added his or her own expressive content to the work beyond the mark itself. As *Rogers* explains, the concern that consumers will not be "misled as to the source of [a] product" is generally allayed when the mark is used as only one component of a junior user's larger expressive creation, such that the use of the mark at most "implicitly suggest[s]" that the product is associated with the mark's owner. *Id.* at 998–99; *see* MCCARTHY § 31:144.50 ("[T]he deception or confusion must be relatively obvious and express, not subtle and implied."). But using a mark as the centerpiece of an expressive work itself, unadorned with any artistic contribution by the junior user, may reflect nothing more than an effort to "induce the sale of goods or services" by confusion or "lessen[] the distinctiveness and thus the

---

[10] *Cf. Law & Order: Special Victims Unit* (NBC Universal).

commercial value of" a competitor's mark.  *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 539 (1987).

Our cases support this approach.  In cases involving the use of a mark in the title of an expressive work—such as the title of a movie (*Rogers*), a song (*MCA Records*), a photograph (*Walking Mountain*), or a television show (*Twentieth Century Fox*)—the mark obviously served as only one "element of the [work] and the [junior user's] artistic expressions."  *Rogers*, 875 F.2d at 1001.  Likewise, in the cases extending *Rogers* to instances in which a mark was incorporated into the body of an expressive work, we made clear that the mark served as only one component of the larger expressive work.  In *E.S.S.*, the use of the Pig Pen strip club was "quite incidental to the overall story" of the video game, such that it was not the game's "main selling point." 547 F.3d at 1100–01.  And in *Brown*, Jim Brown was one of "thousands of current and former NFL players" appearing in the game, and nothing on the face of the game explicitly engendered consumer misunderstanding.    724 F.3d at 1244–46.  Indeed, EA altered Brown's likeness in certain versions of the game, an artistic spin that "made consumers *less* likely to believe that Brown was involved."  *Id.* at 1246–47.

In this case, we cannot decide as a matter of law that defendants' use of Gordon's mark was not explicitly misleading.  There is at least a triable issue of fact as to whether defendants simply used Gordon's mark with minimal artistic expression of their own, and used it in the same way that Gordon was using it—to identify the source of humorous greeting cards in which the bottom line is "Honey Badger don't care."  Gordon has introduced evidence that he sold

greeting cards and other merchandise with his mark; that in at least some of defendants' cards, Gordon's mark was used without any other text; and that defendants used the mark knowing that consumers rely on marks on the inside of cards to identify their source. Gordon's evidence is not bulletproof; for example, defendants' cards generally use a slight variation of the HBDGS phrase, and they list defendants' website on the back cover. But a jury could conclude that defendants' use of Gordon's mark on one or more of their cards is "explicitly misleading as to [their] source." *Rogers*, 875 F.2d at 999.

Because we resolve the first *Rogers* prong against Gordon as a matter of law, a jury may find for Gordon only if he proves by a preponderance of the evidence that defendants' use of his mark is explicitly misleading as to the source or content of the cards.[11]

V

For the foregoing reasons, we **REVERSE** and **REMAND** to the district court for further proceedings consistent with this opinion.

---

[11] We note that the district court has not yet addressed defendants' abandonment defense. We express no opinion on that issue and leave it for the district court to address in the first instance.