**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

E.S.S. ENTERTAINMENT 2000, INC.,
d/b/a PLAYPEN,
              *Plaintiff-Appellant,*

              v.

ROCK STAR VIDEOS, INC., e/s/a
ROCKSTAR GAMES, INC.; TAKE-TWO
INTERACTIVE SOFTWARE, INC.,
              *Defendants-Appellees.*

No. 06-56237

D.C. No.
CV-05-02966-
MMM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
March 5, 2008—Pasadena, California

Filed November 5, 2008

Before: John R. Gibson,* Senior Circuit Judge,
Diarmuid F. O'Scannlain and Susan P. Graber,
Circuit Judges.

Opinion by Judge O'Scannlain

---

*The Honorable John R. Gibson, Senior United States Circuit Judge for
the Eighth Circuit, sitting by designation.

---

**COUNSEL**

Robert F. Helfing, Sedgwick, Detert, Moran & Arnold LLP, Los Angeles, California, for the plaintiff-appellant; David A. Schinder, Sedgwick, Detert, Moran & Arnold LLP, Los Angeles, California, and Ernest J. Franceschi, Attorney, Los Angeles, California, were on the briefs.

Russell Frackman, Mitchell Silberberg & Knupp LLP, Los Angeles, California, for the defendants-appellees; Karin G. Pagnanelli and Eric J. German were on the brief.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a producer of a video game in the "Grand Theft Auto" series has a defense under the First Amendment against a claim of trademark infringement.

**I**

**A**

Rockstar Games, Inc. ("Rockstar"), a wholly owned subsidiary of Take-Two Interactive Software, Inc., manufactures and distributes the Grand Theft Auto series of video games (the "Series"), including Grant Theft Auto: San Andreas

("San Andreas" or the "Game"). The Series is known for an irreverent and sometimes crass brand of humor, gratuitous violence and sex, and overall seediness.

Each game in the Series takes place in one or more dystopic, cartoonish cities modeled after actual American urban areas. The games always include a disclaimer stating that the locations depicted are fictional. Players control the game's protagonist, trying to complete various "missions" on a video screen. The plot advances with each mission accomplished until the player, having passed through thousands of cartoon-style places along the way, wins the game.

Consistent with the tone of the Series, San Andreas allows a player to experience a version of West Coast "gangster" culture. The Game takes place in the virtual cities of "Los Santos," "San Fierro," and "Las Venturas," based on Los Angeles, San Francisco, and Las Vegas, respectively.

Los Santos, of course, mimics the look and feel of actual Los Angeles neighborhoods. Instead of "Hollywood," "Santa Monica," "Venice Beach," and "Compton," Los Santos contains "Vinewood," "Santa Maria," "Verona Beach," and "Ganton." Rockstar has populated these areas with virtual liquor stores, ammunition dealers, casinos, pawn shops, tattoo parlors, bars, and strip clubs. The brand names, business names, and other aspects of the locations have been changed to fit the irreverent "Los Santos" tone. Not especially saintly, Los Santos is complete with gangs who roam streets inhabited by prostitutes and drug pushers while random gunfire punctuates the soundtrack.

To generate their vision for Los Santos, some of the artists who drew it visited Los Angeles to take reference photographs. The artists took pictures of businesses, streets, and other places in Los Angeles that they thought evoked the San Andreas theme. They then returned home (to Scotland) to draw Los Santos, changing the images from the photographs

as necessary to fit into the fictional world of Los Santos and San Andreas. According to Nikolas Taylor ("Taylor"), the Lead Map Artist for Los Santos, he and other artists did not seek to "re-creat[e] a realistic depiction of Los Angeles; rather, [they] were creating 'Los Santos,' a fictional city that lampooned the seedy underbelly of Los Angeles and the people, business and places [that] comprise it." One neighborhood in the fictional city is "East Los Santos," the Game's version of East Los Angeles. East Los Santos contains variations on the businesses and architecture of the real thing, including a virtual, cartoon-style strip club known as the "Pig Pen."

B

ESS Entertainment 2000, Inc. ("ESS"), operates a strip club, which features females dancing nude, on the eastern edge of downtown Los Angeles under the name Play Pen Gentlemen's Club ("Play Pen"). ESS claims that Rockstar's depiction of an East Los Santos strip club called the Pig Pen infringes its trademark and trade dress associated with the Play Pen.

The Play Pen's "logo" consists of the words "the Play Pen" (and the lower-and upper-case letters forming those words) and the phrase "Totally Nude" displayed in a publicly available font, with a silhouette of a nude female dancer inside the stem of the first "P." Apparently, ESS has no physical master or precise template for its logo. Different artists draw the nude silhouette in Play Pen's logo anew for each representation, although any final drawing must be acceptable to Play Pen's owners. There are several different versions of the silhouette, and some advertisements and signs for the Play Pen do not contain the nude silhouettes.

Although the artists took some inspiration from their photographs of the Play Pen, it seems they used photographs of other East Los Angeles locations to design other aspects of

the Pig Pen. The Pig Pen building in Los Santos, for instance, lacks certain characteristics of the Play Pen building such as a stone facade, a valet stand, large plants and gold columns around the entrance, and a six-foot black iron fence around the parking lot. The Play Pen also has a red, white, and blue pole sign near the premises, which includes a trio of nude silhouettes above the logo and a separate "Totally Nude" sign below. The Pig Pen does not.

C

On April 22, 2005, ESS filed the underlying trademark violation action in district court against Rockstar. ESS asserted four claims: (1) trade dress infringement and unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);[1] (2) trademark infringement under California Business and Professions Code § 14320;[2] (3) unfair competition under California Business and Professions Code §§ 17200 et seq.; and (4) unfair competition under California common law. The heart of ESS's complaint is that Rockstar has used Play Pen's distinctive logo and trade dress without its authorization and has created a likelihood of confusion among consumers as to whether ESS has endorsed, or is associated with, the video depiction.

---

[1]"Trade dress involves the total image of a product and may include features such as size, shape, color or color combination, texture, graphics, or even particular sales technique." *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 808 n.13 (9th Cir. 2003) (internal quotation marks and citations omitted). Because the only relevant similarities at issue in this case involve the use of the "Pig Pen" mark versus the "Play Pen" mark, disposition of the trade dress infringement claim follows resolution of the trademark infringement claim. *See Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998) ("Section 43(a) now protects both trademarks and trade dress from infringement . . . [and] there is no persuasive reason to apply different analysis [sic] to the two." (internal quotation marks, alteration and citation omitted)).

[2]This section has recently been repealed. Cal. Stats. ch. 711 § 1. Since we hold that Rockstar has a defense to all of ESS's claims, the repeal is irrelevant to our decision.

In response, Rockstar moved for summary judgment on all of ESS's claims, arguing that the affirmative defenses of nominative fair use and the First Amendment protected it against liability. It also argued that its use of ESS's intellectual property did not infringe ESS's trademark by creating a "likelihood of confusion."

Although the district court rejected Rockstar's nominative fair use defense, it granted summary judgment based on the First Amendment defense. The district court did not address the merits of the trademark claim because its finding that Rockstar had a defense against liability made such analysis unnecessary.

## II

Rockstar argues that, regardless of whether it infringed ESS's trademark under the Lanham Act or related California law, it is entitled to two defenses: one under the nominative fair use doctrine and one under the First Amendment.

## A

**[1]** "Unlike a traditional fair use scenario, [nominative fair use occurs when] the defendant . . . us[es] the trademarked term to describe not its own product, but the plaintiff's." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002). The doctrine protects those who deliberately use another's trademark or trade dress "for the 'purposes of comparison, criticism[,] or point of reference.' " *Walking Mountain*, 353 F.3d at 809 (alteration omitted) (quoting *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992)). In this case, however, Rockstar's use of "Pig Pen" is not "identical to the plaintiff's [Play Pen] mark." Furthermore, the district court observed that Rockstar's Lead Map Artist "testified the goal in designing the Pig Pen was . . . not to comment on Play Pen *per se*." Since Rockstar did not use the trademarked logo to describe ESS's strip club, the district

court correctly held that the nominative fair use defense does not apply in this case. *See Welles*, 279 F.3d at 801.

### B

**[2]** Rockstar's second defense asks us to consider the intersection of trademark law and the First Amendment. The road is well traveled. We have adopted the Second Circuit's approach from *Rogers v. Grimaldi*, which "requires courts to construe the Lanham Act 'to apply to artistic works *only* where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression.' " *Walking Mountain*, 353 F.3d at 807 (emphasis in original) (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)). The specific test contains two prongs. An artistic work's use of a trademark that otherwise would violate the Lanham Act is not actionable " 'unless the [use of the mark] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [it] explicitly misleads as to the source or the content of the work.' " *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002) (quoting *Rogers*, 875 F.2d at 999). Although this test traditionally applies to uses of a trademark in the title of an artistic work, there is no principled reason why it ought not also apply to the use of a trademark in the body of the work. *See Walking Mountain*, 353 F.3d at 809 n.17 (implying that it would be acceptable to apply the *Rogers* test to non-titular trade dress claim). The parties do not dispute such an extension of the doctrine.

### 1

We first adopted the *Rogers* test in *MCA Records*, a case which is instructive for that reason. *MCA Records*, 296 F.3d at 902 ("We agree with the Second Circuit's analysis and adopt the *Rogers* standard as our own."). In *MCA Records*, the maker of the iconic "Barbie" dolls sued MCA for trademark infringement in the title of a song the record company

had released, called "Barbie Girl." *Id.* at 899-900. The song was a commentary "about Barbie and the values . . . she [supposedly] represents." *Id.* at 902. Applying *Rogers*, the court held that the First Amendment protected the record company. The first prong was straightforward. Because the song was about Barbie, "the use of Barbie in the song title clearly is relevant to the underlying work." *Id.; see also Walking Mountain*, 353 F.3d at 807 (holding that use of Barbie doll in photographic parody was relevant to the underlying work).

Moving to the second prong, we made an important point. "The *only* indication," we observed, "that Mattel might be associated with the song is the use of Barbie in the title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity." *MCA Records*, 296 F.2d at 902 (emphasis in original). This makes good sense. After all, a trademark infringement claim presupposes a use of the mark. If that necessary element in every trademark case vitiated a First Amendment defense, the First Amendment would provide no defense at all.

2

Keeping *MCA Records* and related cases in mind, we now turn to the matter before us. ESS concedes that the Game is artistic and that therefore the *Rogers* test applies. However, ESS argues both that the incorporation of the Pig Pen into the Game has no artistic relevance and that it is explicitly misleading. It rests its argument on two observations: (1) the Game is not "about" ESS's Play Pen club the way that "Barbie Girl" was "about" the Barbie doll in *MCA Records*; and (2) also unlike the Barbie case, where the trademark and trade dress at issue was a cultural icon (Barbie), the Play Pen is not a cultural icon.

**[3]** ESS's objections, though factually accurate, miss the point. Under *MCA Records* and the cases that followed it, only the use of a trademark with " '*no* artistic relevance to the

underlying work *whatsoever*' " does not merit First Amendment protection. *Id.* (emphasis added) (quoting *Rogers*, 875 F.2d at 999). In other words, the level of relevance merely must be above zero. It is true that the Game is not "about" the Play Pen the way that Barbie Girl was about Barbie. But, given the low threshold the Game must surmount, that fact is hardly dispositive. It is also true that Play Pen has little cultural significance, but the same could be said about most of the individual establishments in East Los Angeles. Like most urban neighborhoods, its distinctiveness lies in its "look and feel," not in particular destinations as in a downtown or tourist district. And that neighborhood, with all that characterizes it, *is* relevant to Rockstar's artistic goal, which is to develop a cartoon-style parody of East Los Angeles. Possibly the only way, and certainly a reasonable way, to do that is to recreate a critical mass of the businesses and buildings that constitute it. In this context, we conclude that to include a strip club that is similar in look and feel to the Play Pen does indeed have at least "some artistic relevance." *See id.*

3

**[4]** ESS also argues that Rockstar's use of the Pig Pen " 'explicitly misleads as to the source or the content of the work.' " *Id.* (quoting *Rogers*, 875 F.2d at 999). This prong of the test points directly at the purpose of trademark law, namely to "avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner." *Walking Mountain*, 353 F.3d at 806 (internal quotation marks and alteration omitted). The relevant question, therefore, is whether the Game would confuse its players into thinking that the Play Pen is somehow behind the Pig Pen or that it sponsors Rockstar's product. In answering that question, we keep in mind our observation in *MCA Records* that the mere use of a trademark alone cannot suffice to make such use explicitly misleading. *See MCA Records*, 296 F.3d at 902.

**[5]** Both San Andreas and the Play Pen offer a form of low-brow entertainment; besides this general similarity, they have nothing in common. The San Andreas Game is not complementary to the Play Pen; video games and strip clubs do not go together like a horse and carriage or, perish the thought, love and marriage. Nothing indicates that the buying public would reasonably have believed that ESS produced the video game or, for that matter, that Rockstar operated a strip club. A player can enter the virtual strip club in Los Santos, but ESS has provided no evidence that the setting is anything but generic. It also seems far-fetched that someone playing San Andreas would think ESS had provided whatever expertise, support, or unique strip-club knowledge it possesses to the production of the game. After all, the Game does not revolve around running or patronizing a strip club. Whatever one can do at the Pig Pen seems quite incidental to the overall story of the Game. A reasonable consumer would not think a company that owns one strip club in East Los Angeles, which is not well known to the public at large, also produces a technologically sophisticated video game like San Andreas.

**[6]** Undeterred, ESS also argues that, because players are free to ignore the storyline and spend as much time as they want at the Pig Pen, the Pig Pen can be considered a significant part of the Game, leading to confusion. But fans can spend all nine innings of a baseball game at the hot dog stand; that hardly makes Dodger Stadium a butcher's shop. In other words, the chance to attend a virtual strip club is unambiguously *not* the main selling point of the Game.

### III

**[7]** Considering all of the foregoing, we conclude that Rockstar's modification of ESS's trademark is not explicitly misleading and is thus protected by the First Amendment. Since the First Amendment defense applies equally to ESS's state law claims as to its Lanham Act claim, the district court

properly dismissed the entire case on Rockstar's motion for summary judgment.

**AFFIRMED.**