**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LANCE HARA, formerly known as Vicky Vox, | No. 23-3768 |
| *Plaintiff - Appellant*, | D.C. No. 2:23-cv-03456-RGK-AS |
| v. | |
| NETFLIX, INC.; TITMOUSE, INC.; LOL SEND, INC.; FREMULON, LLC; UNIVERSAL TELEVISION GROUP LLC; HAZY MILLS PRODUCTIONS, INC.; 3 ARTS ENTERTAINMENT, LLC; GABE LIEDMAN; MICHAEL SCHUR; SEAN HAYES; TODD MILLINER; BEN HEINS; DAVID MINER, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted October 23, 2024
San Francisco, California

Filed July 28, 2025

Before: Richard R. Clifton, Jennifer Sung, and Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez

## SUMMARY[*]

### Lanham Act

The panel affirmed the district court's dismissal of an action brought under the Lanham Act by Lance Hara, professionally known as Vicky Vox, against Netflix, Inc., and others connected with the animated show *Q-Force*.

Vox alleged that an animated version of her likeness appeared in a ten-second scene in the show as well as in the official teaser and still image promoting the series. She sued for unfair competition and false endorsement under 15 U.S.C. § 1125, alleging that the unauthorized use of her image and likeness led viewers to believe that she endorsed *Q-Force*.

The panel held that following *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023), when the challenged mark in an artistic work is used not to designate a work's source, but solely to perform some other expressive function, the *Rogers* test applies. Under the *Rogers* test, the Lanham Act does not apply to an expressive work unless the use of the trademark or other identifying material has no

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

artistic relevance to the underlying work or explicitly misleads as to the source or the content of the work.

The panel concluded that defendants' alleged use of Vox's image and likeness in one episode of *Q-Force* and the related teaser and still image in no way suggested or identified Vox as a source or origin of the show. Accordingly, the *Rogers* test applied. Under the *Rogers* test, the use of Vox's likeness had artistic relevance to *Q-Force*, and there was no overt claim or explicit misstatement that Vox was the source of *Q-Force*. Vox therefore failed to satisfy either prong of the *Rogers* test.

**COUNSEL**

Heather L. Blaise (argued) and John H. Mattheessen, Valkyrie Law Group PC, Chicago, Illinois, for Plaintiff-Appellant.

Diana Palacios (argued), Cristina M. Salvato, and Joel Richert, Davis Wright Tremaine LLP, Los Angeles, California, for Defendants-Appellees.

Susan J. Kohlmann and Allison N. Douglis, Jenner & Block LLP, New York, New York; Kara V. Brandeisky, Jenner & Block LLP, Washington, D.C.; for Amicus Curiae the Motion Picture Association, Inc..

## OPINION

SANCHEZ, Circuit Judge:

This case presents a straightforward, but nonetheless novel, question of law: In light of the Supreme Court's narrow decision in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023), does the *Rogers* test apply to a trademark infringement claim involving an animated television series where the allegedly infringing mark was not used to designate the source or origin of the show? *See Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). Given the fleeting use of Vicky Vox's ("Vox's") image and likeness "solely to perform some other expressive function" on the Netflix show, *Q-Force*, the answer is yes. *Jack Daniel's*, 599 U.S. at 154. We affirm the district court's conclusion that the *Rogers* test applies and forecloses Vox's claims under the Lanham Act.

## I.

Plaintiff-Appellant Lance Hara, professionally known as Vicky Vox, appeals the district court's dismissal of her First Amended Complaint ("FAC") against Defendants-Appellees Netflix, Inc. ("Netflix") and others connected with the show. In 2021, Netflix released an animated series, *Q-Force*, about a group of underappreciated queer spies who must save the planet from various dangers. Vox claims that an animated version of her likeness appears in a single ten-second scene as well as the official teaser and still image promoting the series. Vox sued under section 43(a) of the Lanham Act, 15 U.S.C. § 1125, alleging that the unauthorized use of her image and likeness led viewers to believe that she endorsed *Q-Force*.

The FAC alleges that *Q-Force* is "an animated series about 'gay James Bond.'" Specifically, *Q-Force* is "about a group of LGBT spies working for the American Intelligence Agency . . . who, despite being the best in their field, are undervalued due to their sexualities and identities." Defendant-Appellee Gabe Liedman ("Liedman"), the co-creator and writer of *Q-Force*, "publicly admitted that every character in *Q-Force* is based on someone in real life in order to ground the Project in reality." *Q-Force* is streaming on Netflix and consists of ten thirty-minute episodes.

Vox is a "well-known Drag Queen in Hollywood." She regularly hosts drag events in West Hollywood and is best known for her drag band. She has appeared in theater productions, reality television shows, films, and music videos. During her events and performances, "Vox commonly uses a fan as part of her drag persona." Vox alleges that her image and likeness is featured in episode five of *Q-Force*, the official teaser for the show, and a still image that Netflix provided to an online LGBT publication, *Them*. Episode five of *Q-Force*, the official teaser, and the still image allegedly show Vox's "voluminous red-orange hair styled with a center part, defined, close together eyebrows, cat-eye make-up, face shape, nose structure, full jawline, high cheek bones, [and] full bodied figure."

 

In the ten-second scene of episode five, one of the main characters, a gay spy named Twink, is having cocktails in a West Hollywood gay bar while surrounded by a group of four unnamed drag queens who do not speak. Agent Steve Maryweather, *Q-Force*'s protagonist and leader of the LGBT spy squad, calls out to Twink from across the bar. Twink replies, "Oh, hey, girl!" and then turns to the four drag queens and whispers, "That's my job daddy." The drag queens then turn to check out Agent Maryweather, three of whom pull out eyewear (hot pink sunglasses, opera glasses, and a monocle) to get a better look at this buff "gay James Bond." The fourth drag queen, Vox, "thworps" open an orange folding fan with the word "Hot" emblazoned across the fan.[1] Twink then states, "Right? Anyway, don't let me keep you from your hollandaise. Just having a union meeting over here." That is the extent to which Vox appears in the series.

Around June 2021, Netflix posted an official teaser for *Q-Force* on YouTube,[2] which stated, "[n]ever hide who you are. Unless you're undercover. Q-FORCE, the first queer spy division, is coming to Netflix on September 2, [2021]." The official teaser contains links soliciting consumers to subscribe to Netflix's YouTube channel and subscription streaming service, and to make purchases on Netflix's online merchandise store. Liedman admitted that the official teaser was "timed to come out during Pride."

---

[1]  The official teaser for the series, which opens with a clip from this scene, cuts away at this point to introduce the members of *Q-Force*.

[2]  The official trailer for the show is longer than the official teaser and does not feature Vox in it.



After the teaser was released, Vox was contacted by family, friends, fellow drag performers, and fans who "expressed confusion and concern" regarding her "connection with" *Q-Force*. Vox did not grant Netflix permission to use her image and likeness on the show, official teaser, or still image. Vox brings three causes of action for unfair competition and false endorsement under § 43(a) of the Lanham Act. The other causes of action are state law claims regarding Vox's right of publicity.

The district court dismissed Vox's federal claims with prejudice, finding that because *Q-Force* and its official teaser were expressive works entitled to heightened First Amendment protection under *Rogers*, she had failed to state a claim. The district court dismissed Vox's state law claims for lack of subject-matter jurisdiction. Vox timely appealed.

## II.

Section 43(a) of the Lanham Act provides for a civil cause of action against

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1)(A). "A trademark is a word, phrase or symbol that is used to identify a manufacturer or sponsor of a good or the provider of a service." *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 900 (9th Cir. 2002). It serves an "identifying purpose," for the owner to "prevent[] others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner." *Id.* Although Lanham Act claims "generally relate to the use of trademarks or trade dress to cause consumer confusion over affiliation or endorsement, we have held that claims can also be brought under § 43(a) relating to the use of a public figure's persona, likeness, or other uniquely distinguishing characteristic to cause such confusion." *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1239 (9th Cir. 2013); *see also Waits v.*

*Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992) ("A false endorsement claim based on the unauthorized use of a celebrity's identity . . . alleges the misuse of a trademark, *i.e.*, a symbol or device such as a visual likeness . . . , which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product."); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992) ("In cases involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona.").

Section 43(a) claims are normally reviewed under the likelihood-of-confusion test. *See Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017); *Brown*, 724 F.3d at 1241–43. Under this test, we inquire "whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks," applying the eight "*Sleekcraft*" factors to facilitate our inquiry. *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998); *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), *abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods*., 353 F.3d 792, 810 n.19 (9th Cir. 2003). When the alleged infringement involves the title or some other aspect of an expressive work, however, we employ the *Rogers* test to determine whether the Lanham Act applies. *See Twentieth Century Fox*, 875 F.3d at 1196 (citing *Mattel*, 296 F.3d at 902).

*Rogers* concerned the 1986 film "Ginger and Fred." *Rogers*, 875 F.2d at 996–97. The film is a work of fiction about two Italian cabaret performers, named Pippo and Amelia, who developed an act imitating Ginger Rogers and Fred Astaire. *Id.* Rogers sued under the Lanham Act, alleging that the title "creat[ed] the false impression that the film was about her or that she sponsored, endorsed, or was

otherwise involved in the film." *Id.* at 997. Recognizing a First Amendment interest in protecting expressive works, the Second Circuit held that "in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 999. *Rogers* observed that expressive works may reference a celebrity "without any overt indication of authorship or endorsement," such as the song titled "Bette Davis Eyes." *Id.* In these situations—where the celebrity is not overtly identified as the source or sponsor of the work—*Rogers* concluded there is only a "slight risk" of consumer confusion. *Id.* at 999–1000. After weighing that risk against "the danger of restricting artistic expression," *Rogers* held that the Lanham Act claim was precluded. *Id.* at 1000.

Our circuit does not apply § 43(a) of the Lanham Act to expressive works "unless the [use of the trademark or other identifying material] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [use of trademark or other identifying material] explicitly misleads as to the source or the content of the work." *Brown*, 724 F.3d at 1239 (quoting *Rogers*, 875 F.2d at 999). In *Mattel,* for example, the Barbie doll maker sued the European pop band Aqua for trademark infringement over their song "Barbie Girl," which featured lyrics such as "I'm a blond[e] bimbo girl, in a fantasy world" and "Life in plastic, it's fantastic." 296 F.3d at 901. Applying *Rogers*, we held that the song title used the Barbie mark in an artistically relevant manner to foreshadow the satirical message of the song poking fun at Barbie and the values Aqua claims she represents. *Id.* We also concluded that the song title "does not explicitly mislead as to the source of the work" in that "it does not, explicitly or

otherwise, suggest that it was produced by Mattel." *Id.* at 902. Aqua and MCA Records, Inc. were therefore not subject to trademark liability for use of the Barbie mark in the song title. *Id.*

We have applied *Rogers* in contexts in which the allegedly infringing use of a trademark involved the title or body of a creative work.[3] Vox argues that "the cases applying the *Rogers* test and rejecting the likelihood of confusion test should not be relied upon" following the Supreme Court's recent decision in *Jack Daniel's*. Vox misinterprets the Court's narrow decision in *Jack Daniel's* and its applicability to her case.

As Vox concedes, *Jack Daniel's* did not overrule *Rogers*. In addressing a trademark infringement claim, *Jack Daniel's* declined to reach the broader merits of the *Rogers* test and whether it is appropriate to apply a threshold First Amendment inquiry to trademark infringement claims that involve expressive works. *See Jack Daniel's*, 599 U.S. at 145 ("[W]e do not decide whether the threshold [*Rogers*] inquiry applied in the Court of Appeals is ever warranted."); *id.* at 155 (taking "no position" on the validity of *Rogers*). Instead, the Court narrowed its holding to one situation where the *Rogers* test does not apply. "Without deciding whether *Rogers* has merit in other contexts, we hold that it does not when an alleged infringer uses a trademark in the

---

[3] *See, e.g.*, *Walking Mountain Prods.*, 353 F.3d at 796, 807 (photographs); *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1096–99 (video game); *Brown*, 724 F.3d at 1239–42 (video game); *Twentieth Century Fox*, 875 F.3d at 1195–97 (television show title); *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 461–62 (9th Cir. 2020) (book title).

way the Lanham Act most cares about: as a designation of source for the infringer's own goods." *Id.* at 153.

In *Jack Daniel's*, the respondent, VIP Products LLC, manufactured a squeaky, chewable dog toy designed to look like a bottle of Jack Daniel's whiskey. *Id.* at 144. "On the toy, for example, the words 'Jack Daniel's' become 'Bad Spaniels.' And the descriptive phrase 'Old No. 7 Brand Tennessee Sour Mash Whiskey' turns into 'The Old No. 2 On Your Tennessee Carpet.'" *Id.* Petitioner Jack Daniel's, which owns trademarks in the distinctive square Jack Daniel's bottle and many of the words and graphics on the label, sued for trademark infringement and dilution. *Id.* at 148–51. Petitioner alleged that "Bad Spaniels" infringed the marks by causing consumers to believe that Jack Daniel's had created the dog chew toy, and diluted the marks by associating the famous whiskey company with a crass novelty product. *Id.* at 144.

Despite the parodic and creative uses of the trademarks, the Court held that the *Rogers* test is inapplicable "when the accused infringer has used a trademark to designate the source of its own goods—in other words, has used a trademark as a trademark." *Id.* at 145. The primary function of every trademark, the Court explained, is "to identify the origin or ownership of the article to which it is affixed." *Id.* at 146. "[W]hether the use of a mark is serving a source-designation function" is crucial to the Lanham Act's objective of "ensur[ing] that consumers can tell where goods come from." *Id.* at 163. When VIP "use[d] its Bad Spaniels trademark and trade dress as source identifiers of its dog toy," *id.* at 159–60, the Court held, "[t]hat kind of use falls within the heartland of trademark law" and "does not receive special First Amendment protection." *Id.* at 145.

*Jack Daniel's* explained that lower courts applying *Rogers* have cabined it to situations in which "a trademark is used not to designate a work's source, but solely to perform some other expressive function." *Id.* at 154. The Court cited our decision in *Mattel* as properly applying *Rogers* because "the band's use of the Barbie name was 'not [as] a source identifier': The use did not 'speak[] to [the song's] origin.'" *Id.* (quoting *Mattel*, 296 F.3d at 900, 902). On the other hand, courts "routinely conduct likelihood-of-confusion analysis, without mentioning *Rogers*, when trademarks are used as trademarks—*i.e.*, to designate source." *Id.* at 155. The Court observed that "the *Rogers* test has applied only to cases involving 'non-trademark uses'"—i.e., "cases in which 'the defendant has used the mark' at issue in a 'non-source-identifying way.'" *Id.* at 155–56 (citations omitted). That is so even when the "use of a mark has other expressive content—*i.e.*, because it conveys some message on top of source." *Id.* at 157. As the Court reasoned, "few cases would even get to the likelihood-of-confusion inquiry if all expressive content triggered the *Rogers* filter." *Id.* at 158–59.

More recently, we applied *Jack Daniel's* in a trademark infringement suit involving two companies that used the word "Punchbowl" in their respective marks. *See Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022 (9th Cir. 2024). We emphasized that "[t]he Court in *Jack Daniel's* was careful to note that it was not opining on the broader validity of the *Rogers* test." *Id.* at 1029. "[B]ecause the Supreme Court's decision in *Jack Daniel's* was confined to a 'narrow' point of law, that *Rogers* does not apply when a mark is used as a mark, preexisting Ninth Circuit precedent adopting and applying *Rogers* otherwise remains intact and binding on three-judge panels." *Id.* at 1031 (internal citation

omitted). Accordingly, we apply the guiding principle that when the challenged mark in an artistic work is "used not to designate a work's source, but solely to perform some other expressive function," *Jack Daniel's*, 599 U.S. at 154, the *Rogers* test applies.

## III.

## A.

We first determine whether Defendants allegedly used Vox's trademark image and likeness on *Q-Force* in a source-identifying manner or whether the mark was instead used to perform some other expressive function. We review the district court's dismissal of Vox's complaint de novo, taking "all well-pleaded factual allegations in the complaint as true" and "construing them in the light most favorable to the nonmoving party." *Abcarian v. Levine*, 972 F.3d 1019, 1022 (9th Cir. 2020) (internal quotation marks and citation omitted). We conclude that the *Rogers* test applies because the alleged ten-second use of Vox's image and likeness in one episode of *Q-Force* and the related teaser and still image in no way suggests or identifies Vox as a source or origin of the show.

Recall that *Q-Force* is a series about a group of LGBT spies who, despite being undervalued by their bosses due to their sexualities and identities, must use their formidable talents to save the world. The bar scene in episode five is incidental to the overall theme of the episode and series. The scene depicts the show's "gay James Bond," Agent Maryweather, looked over admiringly by Agent Twink and four unnamed drag queens at a West Hollywood gay bar. According to the FAC, the animated drag queen alleged to resemble Vox is shown "as an unspeaking background character whose sole role is to perform a fan 'thworp' as a

punchline to another character's joke." Vox complains that the show reduced her long and accomplished career as a drag queen performer to that of "a mere element of the setting, a part of the furniture."

While it is understandable that Vox would not want her image to be reduced to a prop or background element, the allegations fail to establish that Vox's likeness was used by Defendants *as a mark*. That is, Vox does not allege that the use of her likeness in *Q-Force*, the official teaser, or the still image indicated or even suggested that she was the source or origin of the series. Like *Mattel*, Defendants' alleged use of Vox's image "d[oes] not 'speak[] to [the series'] origin.'" *Jack Daniel's*, 599 U.S. at 154 (quoting *Mattel*, 296 F.3d at 902); *see also id.* ("[A] consumer would no more think that the [Barbie Girl] song was 'produced by Mattel' than would, 'upon hearing Janis Joplin croon 'Oh Lord, won't you buy me a Mercedes Benz?,' . . . suspect that she and the carmaker had entered into a joint venture.'" (quoting *Mattel*, 296 F.3d at 902)).

Rather, Vox's image and likeness in the ten-second scene is used "solely to perform some other expressive function" for the series. *Id.* As discussed, her character performs a fan "thworp" that sets up the punchline to a joke about hunky Agent Maryweather, reflecting the banter and style of humor used in the series. Vox's likeness, along with three other distinctive-looking drag queens, helps ground the scene of a West Hollywood gay bar in realism. As Vox alleges, the show's creators "publicly admitted that every character in *Q-Force* is based on someone in real life in order to ground the Project in reality." In this way, the alleged use of Vox's image in *Q-Force* is no different than the use of football legend Jim Brown's likeness in the *Madden NFL* video game, *Brown*, 724 F.3d at 1238–40, the use of a

fictional hip-hop record label named "Empire Enterprises" in a television show, *Twentieth Century Fox*, 875 F.3d at 1195, or the use of a virtual strip club in the video game Grand Theft Auto, *E.S.S. Ent. 2000*, 547 F.3d at 1097–99. We applied *Rogers* to each of these examples because the use of a name, likeness, or trademark to imbue a setting or expressive work with a sense of realism constituted uses of a mark in "non-source-identifying way[s]." *Jack Daniel's*, 599 U.S. at 155–56 (citation omitted).

Contrast this with the dog chew toy in *Jack Daniel's*, which used the "Bad Spaniels" trademark as a source identifier. *Id.* at 159–60. By employing the similar square shape and size of the Jack Daniel's bottle as well as its black and white stylized text, VIP invoked an image of the Jack Daniel's classic whiskey bottle. *Id.* at 148–49. VIP conceded that "it both own[ed] and use[d] the Bad Spaniels trademark and trade dress for its durable rubber squeaky novelty dog toy." *Id.* at 160 (internal quotation marks and citation omitted). VIP "consistently argued in court that it owns, though has never registered, the trademark and trade dress in dog toys like 'Jose Perro' (*cf.* Jose Cuervo) and 'HeinieSniff 'n' (*cf.* Heineken)." *Id.* The infringing trademark in *Jack Daniel's* was therefore used to designate the source and ownership of its own good. Such facts are not alleged in this case, nor could they be given the fleeting use of Vox's likeness on the show.

Vox does not meaningfully dispute that Netflix did not use her mark to identify her as the owner or origin of *Q-Force*. Instead, Vox asserts that the *Rogers* test is nevertheless inapplicable because Netflix's use of her likeness "create[d] the false impression among consumers" that she endorses *Q-Force* as well as the unrelated products advertised in connection with *Q-Force*'s official teaser on

YouTube.[4]  Vox contends that "the distinction between false designation of source and false endorsement, association and/or affiliation is immaterial, as both trigger the likelihood of confusion analysis because the prohibition of both infringing acts emanates from a single section of the Lanham Act."  We disagree.

*Jack Daniel's* explained that while trademarks can do many other things, their central feature—what "the Lanham Act most cares about"—is "as a designation of source for the infringer's own goods." *Id.* at 153.

> From its definition of "trademark" onward, the Lanham Act views marks as source identifiers—as things that function to "indicate the source" of goods, and so to "distinguish" them from ones "manufactured or sold by others."  The cardinal sin under [trademark] law . . . is to confuse consumers about source—to make (some of) them think that one producer's products are another's. And that kind of confusion is most likely to arise when someone uses another's trademark as a trademark—meaning, again,

---

[4]  Netflix's alleged advertisement of unrelated products refers to the banner advertising for third-party products that automatically populates on its YouTube channel.  But as Netflix points out, "the fact that the YouTube webpage where the Official Teaser is posted automatically populates with digital banner advertisements for third-party products, does not somehow transform the Official Teaser into an advertisement for *Stranger Things* trading cards or a 'Yu-Gi-Oh BE@RBrick toy.'"

> as a source identifier—rather than for some
> other expressive function.

*Id.* at 156–57 (internal citations omitted).

*Jack Daniel's* made clear that use of an infringing mark for source-designation is what disallows application of the *Rogers* test, not other uses such as affiliation or implied endorsement. The Court cited *Louis Vuitton Malletier S.A. v. Warner Bros. Entertainment Inc.*, 868 F. Supp. 2d 172 (S.D.N.Y. 2012), as an example in which dismissal of a complaint made sense under *Rogers*. *Jack Daniel's*, 599 U.S. at 154–55. Louis Vuitton sued Warner Bros. because a character in the film *The Hangover: Part II* described his knock-off luggage as a "Louis Vuitton" (pronouncing it "Lewis"). *Louis Vuitton*, 868 F. Supp. 2d at 175, 178. The parties agreed that the film was not using the Louis Vuitton mark as its "own identifying trademark." *Id.* at 180 (internal quotation marks and citation omitted). Nevertheless, Louis Vuitton sued because consumers might believe it "ha[d] sponsored and approved Warner Bros.' use and misrepresentation of the infringing [knock-off b]ag as a genuine product of Louis Vuitton." *Id.* at 175 (internal quotation marks and citation omitted).

The district court dismissed the complaint under *Rogers*, finding that "the Lanham Act accommodates the public's interest in free expression by restricting its application to those situations that present the greatest risk of consumer confusion: namely, when trademarks are used to 'dupe[] consumers into buying a product they mistakenly believe is sponsored by the trademark owner.'" *Id.* at 180 (quoting

*E.S.S. Ent. 2000*, 547 F.3d at 1100).[5] As the Supreme Court indicated in *Jack Daniel's*, simply depicting a trademark in a film does not constitute use of that mark as a source identifier. *See Jack Daniel's*, 599 U.S. at 154–55. After all, *Rogers* itself involved a claim that the actress Ginger Rogers had endorsed or was affiliated with the film, and yet the court in *Rogers* applied the First Amendment screen in that situation. *See Rogers*, 875 F.2d at 1001.

If a background character with no dialogue in a ten-second scene of an animated series does not trigger the *Rogers* test, then it is hard to imagine when the *Rogers* test would ever apply. In the context before us, where a defendant plainly does not use a trademark as a source identifier, we hold that *Rogers* and its progeny apply.

**B.**

Having determined that *Jack Daniel's* does not foreclose the application of *Rogers* to Vox's Lanham Act claims, we now turn to the *Rogers* test. The *Rogers* test requires the defendant to first "make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment." *Punchbowl*, 90 F.4th at 1028 (internal quotation marks and citation omitted). "If the defendant meets this burden, the Lanham Act does not apply unless the defendant's use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads consumers as to the source or the content of the work." *Id.* (internal quotation marks and citation omitted). "We decide this legal

---

[5] The district court also found that the allegations of confusion were not plausible, noting that no other reference to Louis Vuitton was made in the film and the luggage appeared in the background for less than thirty seconds in total. *Id.* at 182.

question de novo." *Twentieth Century Fox*, 875 F.3d at 1196 (citing *Brown*, 724 F.3d at 1240–41).

**1.**

As an initial matter, the parties do not dispute that *Q-Force* is an expressive work. The series "communicate[s] ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music)." *Brown*, 724 F.3d at 1241 (internal quotation marks and citation omitted); *see also Twentieth Century Fox*, 875 F.3d at 1196 ("The *Empire* television show itself is clearly an expressive work.").

Vox argues, however, that Netflix's use of her likeness extends beyond the body of the show, pointing to the official teaser and still image. We addressed a similar argument in *Twentieth Century Fox*, where the "Empire" mark was used in online advertising, live events, and the sale of consumer goods. 875 F.3d at 1196. "Although it is true that these promotional efforts technically fall outside the title or body of an expressive work, it requires only a minor logical extension of the reasoning of *Rogers* to hold that works protected under its test may be advertised and marketed by name." *Id.* at 1196–97. As we noted, "[t]he balance of First Amendment interests struck in *Rogers* and *Mattel* could be destabilized if the titles of expressive works were protected but could not be used to promote those works." *Id.* at 1197. We ultimately held that promotional activities, even those that produce revenue, are auxiliary to the work itself. *Id.* So too here, the scene in *Q-Force*, its official teaser, and the still image are all subject to the *Rogers* test.

**2.**

Under the first prong of *Rogers*, Lanham Act claims for misappropriating a person's likeness in expressive works are actionable "only if the use of the mark has '*no* artistic relevance to the underlying work *whatsoever.*'" *Punchbowl*, 90 F.4th at 1028 (quoting *E.S.S. Ent. 2000*, 547 F.3d at 1099). The bar for "artistic relevance" is "set low." *Twentieth Century Fox*, 875 F.3d at 1198. Artistic relevance "merely must be above zero." *E.S.S. Ent. 2000*, 547 F.3d at 1100. The use of an animated drag queen alleged to resemble Vox is artistically relevant to *Q-Force* because it is a series "about a group of LGBT spies." In *Q-Force*, Vox "is depicted inside a bar in West Hollywood," the city where Vox allegedly performs and the show is partially set. The episode in which Vox appears is titled "WeHo Confidential." Recreating an animated version of a West Hollywood bar with references to drag queens and cocktails is artistically relevant to the plot and social commentary of *Q-Force*. The alleged use of Vox's likeness is an artistic choice that supports the show's theme and geographic setting, and as discussed above, grounds the scene in a sense of realism. Indeed, Vox herself alleges that the use of her likeness "reduc[es] her identity . . . to a mere element of the setting, a part of the furniture." *See Twentieth Century Fox*, 875 F.3d at 1199 ("A title may have artistic relevance by linking the work to another mark, as with 'Barbie Girl,' or it may have artistic relevance by supporting the themes and geographic setting of the work, as with *Empire*."). Vox's allegations thus fail to satisfy the first prong of *Rogers*.

**3.**

Under the second prong of *Rogers*, if the use of a person's likeness is artistically relevant to the expressive

work, "the creator of the expressive work can be subject to a Lanham Act claim if the creator uses the mark or material to 'explicitly mislead[] [consumers] as to the source or the content of the work.'" *Brown*, 724 F.3d at 1245 (second and third alterations in original) (quoting *Rogers*, 875 F.2d at 999). The relevant question here is whether there was "'an explicit indication, overt claim, or explicit misstatement' about the source of the work." *Punchbowl*, 90 F.4th at 1028 (citation omitted). "[T]he mere use of a trademark alone cannot suffice to make such use explicitly misleading." *E.S.S. Ent. 2000*, 547 F.3d at 1100.

Here, the FAC is devoid of any allegations purporting to show an "overt claim" or "explicit misstatement" that Vox is the source of *Q-Force*. Vox alleges that Liedman "publicly admitted that every character in *Q-Force* is based on someone in real life in order to ground the Project in reality and that in making casting decisions he wanted to hire someone actually in the drag community." Accepting these allegations as true, they do not establish that Netflix made an overt claim or expressly misled consumers into thinking that Vox is somehow behind the series. *See Brown*, 724 F.3d at 1247 ("[A] statement made . . . about all of the likenesses used in the game could not realistically be expected to confuse consumers as to Brown's involvement."). The FAC itself alleges that Defendants briefly used Vox's likeness, along with three other animated drag queens, as a background character of a single scene. That is not enough to satisfy the second prong of *Rogers*. *See id.* at 1246 ("Brown needs to prove that [Electronic Arts ("EA")] explicitly misled consumers about Brown's endorsement of the game, not that EA used Brown's likeness in the game."); *see also Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 271 (9th Cir. 2018) ("[I]n the cases extending *Rogers* to instances

in which a mark was incorporated into the body of an expressive work, we made clear that the mark served as only one component of the larger expressive work.").

Vox alleges that her family, friends, fellow drag performers, and fans contacted her "express[ing] confusion and concern about her connection with" *Q-Force*. Accepting her allegations as true, these allegations are insufficient to satisfy the second prong of *Rogers*. As we explained in *Brown*, "[t]o be relevant, evidence must relate to the nature of the behavior of the identifying material's user, not the impact of the use." 724 F.3d at 1246. Even when Hall of Fame running back Jim Brown was prepared to offer a consumer survey showing that players of *Madden NFL* believed he had endorsed the game, we concluded that such evidence "would not support the claim that the use was explicitly misleading to consumers." *Id.*; *see also Dr. Seuss Enters.*, 983 F.3d at 462 (holding that "Seuss's evidence of consumer confusion in its expert survey" does not satisfy the second prong of *Rogers*). Similarly, even though Vox's close friends, coworkers, and fans expressed confusion about Vox's connection to the show, the allegations fail to demonstrate an "explicit indication," "overt claim," or "explicit misstatement" by Defendants regarding *Q-Force*'s relationship with Vox. *See Brown*, 724 F.3d at 1245 ("'[T]he slight risk that . . . use of a celebrity's [likeness] might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression, and [in the absence of any explicitly misleading statements] the Lanham Act is not applicable.'" (quoting *Rogers*, 875 F.2d at 1000)). Vox fails to satisfy the second prong of the *Rogers* test.

**IV.**

Finally, Vox argues that she was denied the opportunity to conduct discovery concerning actual consumer confusion and Netflix's intent. Actual consumer confusion and intent are only relevant under the likelihood-of-confusion test. *See Sleekcraft*, 599 F.2d at 348–49. Before reaching the *Sleekcraft* factors, Vox must prevail on at least one of the prongs of the *Rogers* test. *See Gordon*, 909 F.3d at 264–65; *Jack Daniel's*, 599 U.S. at 157 ("[T]he *Rogers* test . . . offers an escape from the likelihood-of-confusion inquiry and a shortcut to dismissal."). Vox is not entitled to discovery because she fails to satisfy either prong of the *Rogers* test as a matter of law.

Nor is it likely that further amendment of the complaint would alter the outcome. A second amended complaint cannot show that Defendants allegedly used Vox's likeness in a source-identifying way when, as Vox acknowledges, the use of her image and likeness was limited to a single ten-second scene of the ten-episode series, and there is no indication that she originated the show. Thus, the district court did not abuse its discretion by dismissing the complaint without leave to amend where further amendment would have been futile. *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011).

\*　　　\*　　　\*

This case presents a quintessential example of when the *Rogers* test applies to the use of a trademark in an expressive work following *Jack Daniel's*. Here, Defendants used Vox's image and likeness solely in an expressive manner to lend reality to the setting where part of the series takes place, not to designate Vox as the source or origin of *Q-Force*. We

conclude that the district court properly dismissed Vox's Lanham Act claims under the *Rogers* test.

**AFFIRMED.**